127 S.W.3d 911 (2004)
In the Interest of J.L., A Child.
No. 13-02-044-CV.
Court of Appeals of Texas, Corpus Christi-Edinburg.
February 12, 2004.
*912 Stephen A. Dogget, Attorney At Law, Richmond, for Appellant.
Catherine L. Fisher, Attorney At Law, and David C. Newell, Asst. District Attorney, Richmond, Duke Hooten, Austin, for Appellees.
Before Justices HINOJOSA, DORSEY[1] and MAURICE AMIDEI.[2]

OPINION
Opinion by Justice MAURICE AMIDEI (Assigned).
Appellant, Bettina Chavez, appeals an adverse jury verdict and judgment terminating *913 her parental relationship with her minor son, J.L., and appointing Chris Edwards, the biological father, as sole managing conservator. Appellant contends in her first three issues that the evidence is legally and factually insufficient to terminate her parental rights because there was no proof: (1) that her husband, Frank Chavez, caused the death of one of their children; or (2) that she knew of any conduct of her husband, or any conditions or surroundings which endangered the children, physically or emotionally. Based upon our conclusions and rulings on such issues as stated herein, we reverse and render.

Motion to Dismiss
The State moved to dismiss this appeal for want of jurisdiction on the ground that appellant failed to file her notice of appeal within twenty days after the judgment was signed on August 17, 2001, as required by section 263.405 of the Texas Family Code effective September 1, 2001.[3] Tex. Fam.Code Ann. § 263.405(a) (Vernon 2002). The appellant timely filed a motion for a new trial on September 17, 2001.[4] The trial court overruled the motion for new trial on October 22, 2001, by a signed written order, thereby extending the trial court's plenary power to November 22, 2001, to grant a new trial or to vacate, modify, correct or reform the judgment.[5] Appellant filed a notice of appeal on October 22, 2001. On October 29, 2001, appellant filed a motion to vacate written judgment and to modify, correct or reform judgment pursuant to the court's plenary jurisdiction, and withdrew her notice of appeal. Tex.R. Civ. P. 329b(g). On November 6, 2001, the trial court signed a final order modifying and correcting its August 17, 2001 order, to-wit: correcting the cause numbers on the severed cause and this cause; stating that the court, rather than the jury, found termination was shown by clear and convincing evidence; correcting the spelling of appellant's trial counsel's first name; adding a provision regarding the child's right to inherit; and deleting an erroneous reference to section 161.205 of the Texas Family Code regarding the dismissal of the Texas Department of Protective and Regulatory Services ("TDPRS").[6] The trial court was within its plenary jurisdiction to modify its *914 original order. Lane Bank Equip. Co. v. Smith S. Equip. Inc., 10 S.W.3d 308, 309-14 (Tex.2000); see Tex.R. Civ. P. 320, 329b(a),(e), and (g). The notice of appeal perfecting this appeal was filed by appellant on November 9, 2001, well within 20 days after the order was signed as required by rule 26.1(b) of the Texas Rules of Appellate Procedure. See Tex.R.App. P. 26.1(b), 27.3.
The effect of the new judgment date, not the motion for new trial, extended the time for filing the notice of appeal. See id. The State's motion to dismiss is overruled.
Appellant's Motion to Abate Appeal, For Leave to File Out of Time Motion For New Trial, And For Remand To Trial Court To Determine Out-Of-Time Motion for New Trial
Subsequent to the submission of this case, appellant filed her motion to abate this appeal, and to remand to the trial court for a hearing on her out-of-time motion for new trial. Appellant's motion is based on the State's revealing in the two pending criminal cases against appellant and her husband[7] that it would not call Dr. Patricia Moore, the medical examiner who was the key witness in this termination case, but would instead call Dr. Harry Lee Wilson, a medical examiner from El Paso whose conclusions are in stark contrast to Dr. Moore's conclusions.
Appellant's motion is moot and it is unnecessary that we rule on it, but we take judicial notice of the testimony of Dr. Wilson given in a "Daubert Hearing"[8] on March 19, 2003, in Cause No. 33,424A, State of Texas v. Frank Andrew Chavez, in the District Court of Fort Bend County, Texas, 268th Judicial District, a copy of which is attached to appellant's motion. Relevant portions of Dr. Wilson's testimony will be discussed hereafter in connection with appellant's first three issues. Tex.R. Evid. 201.
Factual and Procedural Background
Chris Edwards and Bettina Lohner Chavez (appellant) were the biological parents of Hallie Lohner, J.L., and another child (the "infant"), although they were not married to each other when the children were born. On April 15, 2000, appellant and Frank Chavez were married after living together and sharing parental responsibilities as to Hallie and J.L. since March 1998.
On one occasion, appellant disagreed with Frank and confronted him when he spanked J.L. for hitting Hallie on the head with a plastic T-ball bat, thereby leaving a bruise on J.L.'s hand. TDPRS investigated but did not find that there was any abuse.
In December 1998, Hallie was hospitalized and was diagnosed as having had a stroke. The hospital and TDPRS investigated, but again ruled out any abuse. Appellant and Frank took Hallie to her pediatrician and to therapy and she got substantially better, but remained clumsier than a normal child. The Chavez's had their third child on October 15, 1999.
*915 On March 31, 2000, Hallie possibly broke her ribs when she fell off a merrygo-round. At the Chavez' wedding Hallie fell down some stairs.
On April 24, 2000, Hallie urinated in her pants at a Wal-Mart store. Frank became upset. When they went home Hallie was standing at the front door waiting for Frank to unlock the door, but when Hallie did not go in the front door immediately as expected or told, Frank who had his hands occupied holding the infant, who was in a baby car seat, used his foot to push Hallie on her buttocks to get her to go in the door. The State produced a statement written by Detective Sodolak and signed by appellant which uses the word "kick" instead of "push."
Between April 24 and May 3, 2000, Hallie appeared well to various people who saw her, but on May 3, 2000 she became ill and threw up. Frank and appellant did not believe she needed medical care, but as they prepared to go to bed, Hallie turned blue and they attempted to give her CPR. A sheriff's deputy came and tried to give CPR without success. Hallie was taken to a hospital in an ambulance and CPR and other procedures were continued. Hallie was pronounced dead at midnight on May 4, 2000.
Dr. Patricia Moore, the medical examiner, ruled Hallie's death was a homicide due to complications from blunt force trauma to the abdomen, even though there were no bruises to her abdomen. Dr. Moore did not determine her death was intentional and offered no opinion as to who killed Hallie or what caused the blunt trauma, except that the force on Hallie would be the same as a child falling from a ten-story building onto a sharp or blunt object. She testified that Hallie's death was due to complications from blunt trauma to the abdomen.
Dr. Wilson testified he knew of no evidence that Frank caused or knew of the original trauma to Hallie's abdomen and disagreed with Dr. Moore that the trauma was equivalent to a fall from a ten-story building or that it would have caused a hole in Hallie's intestine by compressing it against the spine.
Dr. Paul Radelat, a pathologist, did not feel the autopsy findings supported a determination of homicide or abuse.
TDPRS referred appellant to Dr. Baldwin, a psychologist. Dr. Baldwin stated that she absolutely opposed termination. According to Dr. Baldwin, the children should be returned to appellant because she had good parenting skills, and Dr. Baldwin believed appellant would be protective of the children.
Chris Edwards, Hallie's biological father, told Frank after Hallie died that he appreciated the good job Frank had done with the children. Appellant's friend Carrie Murphy said she never saw Frank become angry or violent during the time they lived together and never saw Frank and appellant fight. Appellant did not feel the family argued excessively, and there was no unusual stress in the household.
The jury found that the parent-child relationship between appellant and J.L. should be terminated, but found that the parent-child relationship between appellant and the infant should not be terminated. Also, the jury found that the parent-child relationship between Frank and the infant should not be terminated. After the jury verdict the trial court severed the case as to the infant.

Sufficiency of the Evidence
In the first three of thirteen issues, appellant attacks the jury findings, contending *916 the evidence is legally and factually insufficient to establish, clearly and convincingly, that: (1) she knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; (2) she engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child; and (3) termination was in the best interest of the child.
In parent-child termination proceedings, there is a strong presumption that the children's best interest is usually served by keeping them with their natural parents. Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex.1976). In Wiley it was held:
[T]he presumption is based upon a logical belief that the ties of the natural relationship of parent and child ordinarily furnish strong assurance of genuine efforts on the part of the custodians to provide the child with the best care and opportunities possible, and, as well, the best atmosphere for the mental, moral and emotional development of the child. The natural right which exists between parents and their children is one of constitutional dimensions. The presumptive right of parents is grounded on good policy considerations.
Id.
A petition for involuntary termination of the parent-child relationship may be granted if the court finds by clear and convincing evidence that the parent has either: (1) knowingly placed or allowed the child to remain in conditions or surroundings that endangered the physical or emotional well-being of the child; or (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child; and (3) the termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001(1)(D)(E),(2) (Vernon 2002).
The heightened "clear and convincing evidence" burden of proof alters our legal sufficiency review. In re J.F.C., 96 S.W.3d 256, 256-66 (Tex.2002); In re C.H., 89 S.W.3d 17, 25 (Tex.2002). In conducting a legal sufficiency review in termination cases, we must review all the evidence in the light most favorable to the finding and the judgment to determine "whether the evidence is such that a fact finder could reasonably form a firm belief or conviction" that the grounds for termination were proven. In re J.F.C., 96 S.W.3d at 265-66. In other words, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. Id. at 266. We must also disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. Id. This does not mean that a court must disregard all evidence that does not support the finding, as this could skew the analysis of whether there is clear and convincing evidence. Id. We must consider undisputed evidence even if it does not support the finding. Id. If we determine that no reasonable fact finder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient and render judgment in favor of the parent. Id.
The State argues that for purposes of termination proceedings, a parent can endanger a child's physical or emotional well-being without actually injuring or threatening to injure the child, and that several courts have upheld murder convictions *917 based upon circumstantial evidence though the convictions were proven under a higher burden of proof. While it may be that some murder convictions have been based on circumstantial evidence, the State has not cited any case upholding a murder conviction or a child termination judgment based on circumstantial evidence involving facts where an inference was based upon an inference. Cases cited by appellant hold that the rule against piling inference upon inference is equally applicable in civil cases as well as in criminal cases:
We recognize that proof of a conspiracy may be, and usually must be made by circumstantial evidence, Jernigan v. Wainer, 12 Tex. 189 (1854), but vital facts may not be proved by unreasonable inferences from other facts and circumstances, `No Evidence' and `Insufficient Evidence,' 38 Texas L.Rev. 359, 363; or, as often been said by this court, a vital fact may not be established by piling inference upon inference, as would be required in this case. Rounsaville v. Bullard, 154 Tex. 260, 276 S.W.2d 791(1955); Lobley v. Gilbert, 149 Tex. 493, 236 S.W.2d 121 (1951). To permit proof in this fashion, would violate the rule of Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059 (1898), which requires proof of any vital fact by evidence amounting to something more than a mere scintilla.

Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp., 435 S.W.2d 854, 858 (Tex.1958) (emphasis added). Quoting Summers v. Fort Crockett Hotel, Ltd., 902 S.W.2d 20, 25 (Tex.App.-Houston [1st Dist.] 1995, writ denied), the Amarillo Court of Appeals held in Roth v. FFP Op. Partners, 994 S.W.2d 190 (Tex.App.-Amarillo 1999, pet. denied), that the plaintiff's evidence of causation was based only on speculation:
An ultimate fact may be established by circumstantial evidence, but the circumstances relied upon must have probative force sufficient to constitute a basis of legal inference. It is not enough that the facts raise a mere surmise or suspicion of the existence of the fact or permit a purely speculative conclusion. The circumstances relied on must be of such a character as to be reasonably satisfactory and convincing, and must not be equally consistent with the non-existence of the ultimate fact.

See id. at 197 (emphasis added).
We will review the evidence the State claims to be relevant to the issue of parental termination. The State cites evidence regarding the "rough" discipline of the children by Frank, and appellant's disagreement and physical confrontation with him over how he disciplined the children.[9] In contrasting testimony, appellant had no knowledge of Frank disciplining J.L. with a belt two or three times.
The State further cites the Wal-Mart store mishap wherein Frank, while holding the infant in a baby car seat at the front door and unlocking the door, used his foot to push Hallie on her buttocks to get her to go in the door. Even if this action were construed to be a "kick" rather than a "push," Frank testified that its purpose was to get Hallie in the door, and it did not cause Hallie to fall. Appellant testified that Frank pushed Hallie with his foot, and the word "kick" was used by Detective *918 Sodolak in the statement he wrote and she signed. Appellant disagreed with Frank and had a physical confrontation with him over Frank's handling of Hallie's discipline.
Even assuming Frank "kicked" Hallie on the one occasion and "whipped" J.L. two or three times with a belt, we conclude that such evidence is not sufficient to produce in the mind of the trier of fact a firm belief or conviction that appellant knowingly placed or knowingly allowed the child to remain in conditions, surroundings or with persons endangering the physical or emotional well being of the child. In re C.H., 89 S.W.3d at 22-24.
The State does not define "rough" or cite any authority that holds that Frank's "rough" treatment of the children was dangerous, illegal or prohibited by any standards for disciplining children. Neither can the "rough" treatment incidents be used as evidence to terminate appellant's parental rights, or to infer that Frank killed Hallie as alleged by the State, because the medical examiner and the pathologist could not identify the cause of death and did not implicate Frank.
The autopsy report prepared by Dr. Moore, showed no recent or old fractures. A handwritten addendum to the report, following a second examination, states "possible fracture sites" of two ribs, notes other previous abdominal injuries, and concludes the cause of death was complications of blunt force trauma to the abdomen, and the manner of death was homicide, without an opinion as to who caused the blunt trauma or whether it was intentionally caused.
In Dr. Moore's testimony, she agreed that it was possible that CPR improperly given to a two year old child could cause injury to the liver, but was very unlikely.
Dr. Paul Radelat, a pathologist, did not feel the autopsy findings supported a determination of homicide or abuse, and his opinion was that appellant did not violate any standard of care as the situation unfolded during the hours preceding the call to 911[10] or thereafter. It was Dr. Radelat's opinion that death most likely resulted from complications of trauma to the abdomen, but the fibrous adhesions and foreign body granuloma were consistent with an ongoing low-level intra-abdominal process extending back in time to an uncertain beginning, and confounding his interpretations was (1) the medical intervention by the Community Fire Department EMS Service and by the father, each of whom performed CPR beginning several hours prior to the official announcement of death, (2) the possibility of a cerebral vascular accident at approximately eighteen months of age with seizures super-imposed on a hypercoagualibility state, and (3) as to the manifestations of disease as observed by others, the EMS personnel noted only a distended abdomen with no obvious injuries. (emphasis added).
The criminal case against appellant's husband is based on the same factual underpinnings as this termination proceeding. In the criminal case, the State represented to the court that it was using Dr. Wilson as its expert instead of Dr. Moore, who was the key witness in the termination case. Dr. Wilson's testimony in the Daubert hearing indicates the State's change of position as well as a change of experts as follows:

*919
TDPRS Position Defense Position State's New Position
Termination Termination Criminal Case
Dr. Moore was an expert on the Dr. Moore was not an expert on State will not call Dr. Moore as a
matter she testified to many of the issues she offered witness in the criminal case
 testimony on
Hallie's death was caused by Attacked time estimate and acute Trauma to abdomen led to death
acute trauma to her abdomen trauma as cause of death one to several weeks later
shortly before her death
Rupture of intestine was due to Rupture of intestine was due to Rupture of intestine was due to
severe blunt force trauma to the CPR CPR
abdomen
Areas of acute bleeding in various Areas of bleeding were caused by Areas of bleeding were caused by
places in the chest and abdomen CPR CPR
were caused by blunt force
trauma, not by CPR
Posterior rib fractures are indicators Rib fractures were likely caused Rib fractures were likely caused
of abuse and were not by an accidental fall from a merry-go-round by an accidental fall from a
caused by a fall from a merry-go-round merry-go-round
Frank either inflicted the trauma There is no evidence Frank There is no evidence Frank
to the abdomen or saw it caused or saw the injury to Hallie's caused or knew of the original
happen and covered it up abdomen trauma to Hallie's abdomen
The force which caused the trauma The intestinal hole was caused by The intestinal hole was caused by
was equivalent to a fall from CPR CPR, and was not caused by the
a 10 story building spine pressing against the
 intestine

The State argues that even though there was no direct or eye witness evidence, that there was at least clear and convincing circumstantial evidence that Frank caused the injuries that led to Hallie's death. However there is no evidence that Frank intentionally or negligently inflicted any blunt trauma or injury on any part of Hallie's body which, in medical probability, caused her death. The State claims there is circumstantial evidence to convict Frank for homicide in the death of Hallie. We do not agree. The record does not establish where or how Hallie was injured or who had supervision of her at the time she was injured. There is no clear and convincing evidence in the record to support the State's accusation that Frank killed Hallie or that appellant failed to promptly seek medical attention for Hallie.
The State claims there were two other incidents of "aggression" and "suspicious medical problems," but admits that these incidents were ruled out as abuse at the time. TDPRS found the referrals of the incidents were unfounded. These incidents cannot be used to support the termination issues submitted to the jury even as circumstantial evidence.
To use circumstantial evidence to support the State's theory would require an inference that Frank intentionally inflicted the blunt trauma which caused Hallie's death merely because of his relationship with her and because he had the opportunity to do so. Using circumstantial evidence would require a further inference that appellant knew Frank intentionally inflicted the injury, if any, which caused Hallie's death, and that appellant condoned it and concealed it.
Such a string of inferences merely raises surmise or suspicion and does not *920 have probative force to constitute a basis of legal inference. Roth, 994 S.W.2d at 197. For a legal inference to arise, the circumstances relied on must be of such a character as to be reasonably satisfactory and convincing, and must not be equally consistent with the non-existence of the ultimate fact. Id. Moreover, meager circumstantial evidence from which equally plausible but opposite inferences may be drawn is speculative, and thus legally insufficient to support a finding. Wal-Mart Stores, Inc. v. Gonzalez, 968 S.W.2d 934, 936 (Tex.1998).
In the instant case, Frank lived in the same home with Hallie and shared with appellant her discipline during the time period in question, but many others during such period of time had an opportunity to harm Hallie. The evidence adduced at trial supports other inferences. First, Hallie's death could have resulted from a cerebral vascular accident when she was approximately eighteen months old with seizures super-imposed on a hypercoagualibility state as related by Dr. Radelat. Or, another stroke may have caused Hallie's death.
Second, the blunt trauma to Hallie could have been caused by accidents suffered because of her impairment. On March 31, 2000, she fell off a merry-go-round, possibly breaking her ribs, and on April 15, 2000, she fell down the stairs at Frank and appellant's wedding. Dr. Wilson, the State's new expert in the criminal cases, concluded, contrary to Dr. Moore, that: (1) Hallie's rib fractures were probably caused by the fall from a merry-go-round; (2) Hallie's death was not caused by acute trauma to the abdomen occurring shortly before death; (3) Hallie's death was the end result of a "chronic event" occurring one to several weeks before the child's death; and (4) the injury caused adhesions to form in the intestines, and the adhesions obstructed the fecal stream and caused a progressively toxic state.
Third, the blunt trauma to Hallie could have been the result of an accident while playing with J.L. Frank spanked J.L. with a belt as punishment for hitting Hallie in the head with a plastic T-ball bat.
Fourth, Hallie's death could have resulted from the symptom-free fibrous adhesions and foreign body granuloma consistent with an ongoing low level intra-abdominal process extending back in time to an uncertain beginning as related by Dr. Radelat.
Fifth, Hallie's death could have resulted from damage to the liver during attempted CPR by the EMS service and Frank to save Hallie's life several hours prior to the official announcement of her death as related by Dr. Radelat. Dr. Wilson, testified, contrary to Dr. Moore, that the rupture of the intestine was not caused by some deliberate or accidental trauma before the child became critically ill, but instead was caused by improperly performed CPR after the child became critically ill, and the areas of acute bleeding in various organs in the abdomen and chest were likely caused by CPR. Also, Dr. Wilson concluded that CPR was an appropriate response by appellant.
Dr. Wilson testified that he did not know when or how the trauma to Hallie's abdomen occurred, and he knew of no evidence that Frank caused or knew of the original trauma to Hallie's abdomen. Dr. Wilson testified that he did not agree with Dr. Moore that the trauma was equivalent to a fall from a 10 story building or that it would have caused a hole in the intestine by compressing it against the spine.
*921 It cannot be inferred from the belt whippings and the incident of rough discipline by Frank that he endangered Hallie or the other children, or that appellant knew she was subjecting the children to danger because of acquiescing to Frank's discipline of the children. Appellant was not negligent in seeking medical treatment for Hallie during her last illness, and her conduct in such regard did not endanger Hallie. There was no evidence nor any reasonable inference that Frank caused Hallie's death or endangered any of the children.
Viewing the testimony in the light most favorable to the judgment, as we must, we conclude that the fact finder could not reasonably have formed a firm belief or conviction that the ground for termination was proven. In re J.F.C., 96 S.W.3d at 266. We conclude there is no evidence that appellant knowingly placed or knowingly allowed her child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child, and there is no evidence that appellant engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child. See Tex. Fam.Code Ann. § 161.001(1)(D), (E) (Vernon 2002). The jury could not infer from the circumstantial evidence that appellant violated any subsection of section 161.001. The jury found that appellant did not violate either subsection (D) or (E) as to the infant, which defies understanding or explanation given its finding regarding J.L. There being no violations of subsection (1) of section 161.001, neither the jury nor the trial court could find or deem that termination was in the best interest of J.L. under subsection (2) because findings under both subsections are required. See Tex. Fam.Code Ann. § 161.001 (Vernon 2002).
The above mentioned findings of the jury are set aside. Appellant's issues numbers one, two and three are granted. It is unnecessary to discuss and rule on the remaining ten issues. See Tex.R.App. P. 47.1.
The trial court's judgment terminating the parent-child relationship between appellant and J.L., appointing Chris Edwards as J.L.'s sole managing conservator, and changing J.L.'s name, is hereby reversed and rendered, and appellant's full parental rights and obligations as to J.L. are hereby restored to her; and J.L.'s original name is restored. See In re J.F.C., 96 S.W.3d at 266.
NOTES
[1] Retired Justice J. Bonner Dorsey, who had been assigned to this Court by the Supreme Court of Texas pursuant to section 74.003 of the government code, and whose assignment expired on August 31, 2003, did not participate in this decision. See Tex. Gov't Code Ann. § 74.003 (Vernon Supp.2004).
[2] Former Fourteenth Court of Appeals Justice Maurice Amidei assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code. See Tex. Gov't Code Ann. § 74.003 (Vernon Supp. 2004).
[3] Section 263.405(a) provides in pertinent part: "An appeal of a final order rendered under this subchapter is governed by the rules of the supreme court for accelerated appeals in civil cases and the procedures provided by this section." Tex. Fam.Code Ann. § 263.405 (Vernon 2002). Rule 26.1(b) of the Texas Rules of Appellate Procedure provides that in an accelerated appeal, the notice of appeal must be filed within 20 days after the judgment or order is signed. See Tex.R.App. P. 26.1(b).
[4] Rule 329b(a) of the Texas Rules of Civil Procedure provides: "A motion for new trial, if filed, shall be filed prior to or within thirty days after the judgment or other order complained of is signed." Tex.R. Civ. P. 329b(a).
[5] Rule 329b(e) of the Texas Rules of Civil Procedure provides: "If a motion for new trial is timely filed by any party, the trial court, regardless of whether an appeal has been perfected, has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment until thirty days after all such timely filed motions are overruled, either by a written and signed order or by operation of law, whichever occurs first." (emphasis added). See TEX.R. CIV. P. 329b(e).
[6] Any change, whether or not material or substantial, made in a judgment while the trial court retains plenary power, operates to delay the commencement of the appellate timetable until the date the modified, corrected or reformed judgment is signed. Check v. Mitchell, 758 S.W.2d 755, 756 (Tex. 1988); Quanaim v. Frasco Rest. & Catering, Inc., 17 S.W.3d 30, 35-40 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); see Tex.R. Civ. P. 329b(h).
[7] State v. Frank Chavez, Cause No. 33,424A (original charge of capitol murder of Hallie Lohner was changed to injury to a child); State v. Bettina Chavez, Cause No. 33,422 (injury to a child), are pending in the 268th Judicial District Court of Fort Bend County.
[8] See, e.g., Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[9] TDPRS found that Frank did not abuse J.L. when he spanked him with a belt leaving a bruise on his hand.
[10] He did not believe Hallie's symptoms were sufficient to alert the family to the need for emergency care.